[No. 22257–1–I.   Division One.   October 16, 1989.]

*In the Matter of the Marriage of* THERESA L. TOWER,
*Appellant, and* HUGH C. TOWER,
*Respondent.*

*Nancy Bradburn–Johnson,* for appellant.

*Michael Mallory,* for respondent.

WINSOR, J.—Theresa Tower appeals from a decree of dissolution. She contends that the trial court erred: (1) by awarding her former spouse, Hugh Tower, a disproportionate share of property; (2) by providing that Theresa's maintenance would terminate upon her cohabitation; and (3) by awarding Theresa only $1,200 in attorney fees. We affirm in part and reverse in part.

Theresa and Hugh Tower were married in 1969. They had two children, A., born in 1973, and B., born in 1979. In approximately 1977, Theresa was diagnosed as having multiple sclerosis. The trial court found that by 1988, this progressively debilitating disease "substantially limited" Theresa's activities.

Theresa filed a petition for dissolution that went to trial in January 1988. The trial court awarded the parties joint legal and physical custody of the children. Under the decree, the children spend approximately equal time with Hugh and Theresa.

The decree requires Hugh, who at time of trial had a net monthly income of $2,100, to pay Theresa $621 per month in child support, to maintain health and dental insurance for the children, and to pay for the children's clothing, incidental school expenses, membership fees, school lunches, and other miscellaneous expenses. The child support obligation is subject to annual adjustments in accord with the Washington State Uniform Child Support Guideline Schedule.

At time of trial, the parties' most significant assets were a house, valued by the trial court at $54,000, and Hugh's vested TIAA retirement account, valued at approximately $62,000. The house was subject to a $21,500 mortgage and

needed between $3,000 and $4,000 in repairs. The TIAA account is inaccessible to Hugh until he retires or leaves his current employment.

The trial court awarded the house to Theresa and the retirement account to Hugh. The court also awarded Theresa $8,091 in personal property; Hugh received $5,976 in personal property.[1] Thus, Theresa's net award was $40,591 and Hugh's was $67,976.

The trial court found Theresa's disability caused by multiple sclerosis to be a basis for awarding maintenance and ordered Hugh to pay Theresa $100 per month until A. is emancipated. At that time, the maintenance award will increase to $350 per month. Upon B.'s emancipation, the award will increase to $700 per month. The decree provides that the maintenance award "shall be deemed permanent maintenance, but shall terminate by [Theresa's] remarriage or cohabitation or by her death." Although Theresa allegedly incurred attorney fees in excess of $10,000, the trial court made a fee award against Hugh of $1,200.

## PROPERTY AWARD

On appeal, Theresa first contends that in making its property distribution, the trial court abused its discretion by awarding Hugh a disproportionate share of community property. Although this contention presents a close question, we affirm the award as being within the broad discretion granted the court.

A trial court making a property division in a dissolution proceeding is charged with making a "just and equitable" distribution of property. RCW 26.09.080. To that end, the court is to consider the nature and extent of community and separate property, the duration of the marriage, and each spouse's economic circumstances. RCW 26.09.080. The parties' relative health, age, education, and employability

---

[1]Theresa contends on appeal that Hugh was also awarded additional funds totaling $5,900. This award is not referenced in the findings of fact, or decree. We therefore do not consider it in our review.

may also be considered. "A paramount concern is the economic condition in which the decree will leave the parties." *In re Marriage of Dessauer,* 97 Wn.2d 831, 839, 650 P.2d 1099 (1982), *overruled on other grounds in In re Marriage of Smith,* 100 Wn.2d 319, 669 P.2d 448 (1983).

██ A property distribution need not be equal to be "just and equitable". *In re Marriage of Nicholson,* 17 Wn. App. 110, 117, 561 P.2d 1116 (1977). "The key to an equitable distribution of property is not mathematical preciseness, but fairness." *In re Marriage of Clark,* 13 Wn. App. 805, 810, 538 P.2d 145 (1975). Fairness is attained by considering all circumstances of the marriage and by exercising discretion, not by utilizing inflexible rules. *Clark,* 13 Wn. App. at 810.

The trial court's considerable discretion in making a property division will not be disturbed on appeal absent a manifest abuse of that discretion. *E.g., In re Marriage of Konzen,* 103 Wn.2d 470, 478, 693 P.2d 97, *cert. denied,* 473 U.S. 906, 87 L. Ed. 2d 654, 105 S. Ct. 3530 (1985). A manifest abuse of discretion is a decision manifestly unreasonable or exercised on untenable grounds or for untenable reasons. It is one that no reasonable person would have made. *See, e.g., In re Marriage of Rink,* 18 Wn. App. 549, 554, 571 P.2d 210 (1977).

The record here reveals that the trial court considered alternatives to its ultimate property distribution and endeavored to fairly distribute the parties' limited assets without jeopardizing Theresa's eligibility to receive social security disability benefits. In his oral opinion, the trial judge acknowledged:

that there are alternative ways in which the court might elect to attempt an equitable division. It could include some lien on the home in favor of Mr. Tower, representing a more immediate asset to him, or it could represent a potential encumbrance on the retirement benefit in favor of Mrs. Tower. But there are some problems associated with them in terms of executing on those and really calculating the net result, having in mind social security benefits and some other uncertainties.

The net result of the entire decree, including maintenance and child support provisions, is that the parties will probably have approximately equal monthly disposable incomes, at least until the youngest child is emancipated.[2] Hugh has 63 percent of the property; Theresa has only 37 percent. Such a disproportionate community property award in favor of the only spouse with any significant earning capacity would be an abuse of discretion were it not balanced by long–term maintenance. *See In re Marriage of Washburn,* 101 Wn.2d 168, 178, 677 P.2d 152 (1984). The property division is affirmed.

### TERMINATION OF MAINTENANCE

Theresa next contends that the trial court abused its discretion by ordering that her maintenance terminate upon her "cohabitation." Hugh responds that cohabitation affects the financial condition of a party, and thus may legitimately be used to terminate maintenance.

The trial court's provision terminating maintenance upon cohabitation is not based upon any finding of fact. Nor is any explanation given in the court's oral opinion. The provision may reflect the judge's sense of appropriate public policy.

Whether cohabitation is a factor warranting termination of maintenance is a matter of first impression in this state. The question has been debated in recent years in other jurisdictions, however.[3] Persuasive arguments both for and against termination have been advanced.

---

[2]At time of trial, Hugh's monthly approximate net income was $2,100. From this amount, he is to pay maintenance and child support in the amount of $721, and all clothing, insurance, and other incidental costs associated with the children. Hugh, who has joint physical custody of the children, will also pay for approximately 50 percent of their food.

Theresa's $721 monthly income under the decree is supplemented by $316 per month in social security disability benefits.

[3]Annot., *Divorced or Separated Spouse's Living With Member of Opposite Sex as Affecting Other Spouse's Obligation of Alimony or Support Under Separation Agreement,* 47 A.L.R.4th 38 (1986). One author asserts that as of 1985, 19

Clearly, it is inequitable to permit maintenance payments to be used by the recipient spouse to support or subsidize a cohabitor. *E.g., Morris v. Morris,* 244 Ga. 120, 259 S.E.2d 65, 67 (1979); *Hall v. Hall,* 25 Ill. App. 3d 524, 323 N.E.2d 541, 544–45 (1975); *Popp v. Popp,* 146 Wis. 2d 778, 432 N.W.2d 600, 608 (Ct. App. 1988). On the other hand, a meretricious relationship can be quite transitory. As the court in *Abbott v. Abbott,* 282 N.W.2d 561, 566 (Minn. 1979), pointed out, because there is no legal tie between parties engaged in such a relationship, it can be broken off without obligation. Thus, particularly when the receiving spouse in unemployable, or only marginally so, ordering automatic termination of maintenance upon his or her cohabitation leaves the recipient vulnerable. The recipient could, overnight, be left without support and, thus, become a public charge. Surely, that is not good public policy.

One author who has analyzed numerous cases on this issue states:

> An emerging consensus in the more liberal states allows modification [upon cohabitation] if the wife's economic circumstances have substantially changed, but does not allow modification on the basis of cohabitation per se. . . . [T]he test for modification remains whether the cohabitation relationship has reduced *the financial needs* of the dependent former spouse. The extent of the actual economic dependency, not the status as a cohabitant, must determine the duration of support as well as its amount.

L. Weitzman, *The Divorce Revolution* 44 (1985). More recent cases follow this approach. *See, e.g., Herzog v. Herzog,* 761 S.W.2d 267, 268 (Mo. Ct. App. 1988) (trial court must evaluate new relationship to determine whether equity justifies termination or modification of maintenance on basis of cohabitation); *Popp v. Popp, supra* (where cohabitation resulted in beneficial change in financial con‐

---

states had enacted laws on the issue. L. Weitzman, *The Divorce Revolution* 44 (1985).

dition of recipient spouse, a change of circumstances warranting modification of maintenance award occurred).

██ ██ We also find this approach reasonable. The test for whether cohabitation warrants termination or modification of maintenance must be more than simply whether two people enter into what they hope will be a long–term relationship. Instead, it must be whether the new relationship substantially changes the maintenance recipient's economic circumstances. We, therefore, hold that in a case where long–term maintenance has been appropriately awarded, cohabitation should not automatically trigger termination. Cohabitation can, however, permit a factual determination whether a substantial change in circumstances has occurred which entitles the paying spouse to ask for a reduction or elimination of maintenance.

Theresa also expresses concern that the undefined term cohabitation is vague, and could apply to a friend, relative, or even a medical assistant, as well as to a person with whom she is romantically involved. This concern is unfounded. Undefined, unambiguous terms within a legal document or statute are given their ordinary meaning, which may be determined by referring to a dictionary. *Brenner v. Leake,* 46 Wn. App. 852, 854–55, 732 P.2d 1031 (1987). To cohabit is defined as "to live together as husband and wife [usually] without a legal marriage having been performed". *Webster's Third New International Dictionary* 440 (1971); *see also Taylor v. Taylor,* ___ Conn. App. ___, 551 A.2d 1285, 1286 (1989) (defining cohabitation as a man and woman dwelling together in the manner of husband and wife). Accordingly, unless otherwise defined, a cohabitation provision respecting maintenance in a divorce decree applies only to those relationships that are tantamount to marriage.

We hold that a provision which terminates long–term maintenance because of "cohabitation", even when construed as tantamount to marriage, must be based upon a subsequent finding of substantial change of circumstance in

the recipient's finances.[4] Since the cohabitation issue is a purely legal one, and does not depend on any factual findings, we find it unnecessary to remand for further testimony. We therefore order that the words "or cohabitation" on page 8, line 12, of the decree be stricken and the following sentence be inserted in their place: "Cohabitation may constitute a substantial change of circumstance and entitles the husband to apply to the court for reconsideration of the maintenance award in light of the then financial circumstances of the parties."

## ATTORNEY FEE AWARD

Theresa next contends that the trial court abused its discretion by awarding her only $1,200 in attorney fees. She argues that Hugh is capable of paying at least $3,000 in fees, based upon his gross annual income of $31,700, versus her significantly smaller annual income.

An award of attorney fees in a dissolution proceeding is discretionary with the trial court. RCW 26.09.140.

---

[4]We believe this approach could be applied to considering whether maintenance should be terminated upon remarriage of the recipient spouse. Although RCW 26.09.170(2) establishes a presumption that maintenance will terminate upon remarriage, it does not require that result. Indeed, a very recent study of gender bias in Washington courts recommends that the Legislature reevaluate the statute's presumptive automatic termination of maintenance upon remarriage. Washington State Task Force, *Gender and Justice in the Courts* 145 (1989). We concur in this recommendation.

RCW 26.09.170(2) reflects the traditional assumption that wives are supported by their husbands and, therefore, maintenance need not survive remarriage. This assumption no longer corresponds with reality. In the United States, the percentage of married women employed outside the home rose to 50 percent by 1980, and is projected to reach 67 percent by 1990. L. Weitzman, *The Marriage Contract* 169–70 (1981). Three–quarters of married women working do so full time. "In an era of double–digit inflation, when an ordinary car costs $10,000 and a modest house goes for $100,000, most families desperately need two incomes just to pay their bills." L. Weitzman, at 172. Moreover, many men who remarry have substantial child support/maintenance obligations from a prior marriage and are unable to support a second wife. Consequently, requiring termination of a woman's maintenance upon remarriage limits her remarriage to those men of sufficient means to fully support a wife. This is a harsh and unjust result that does not further sound public policy.

The award will not be disturbed absent proof that the discretion exercised was clearly untenable or manifestly unreasonable. An abuse of discretion is never presumed. *Abel v. Abel,* 47 Wn.2d 816, 818–19, 289 P.2d 724 (1955). In making an award, the trial court "must balance the needs of the spouse requesting them with the ability of the other spouse to pay." *Kruger v. Kruger,* 37 Wn. App. 329, 333, 679 P.2d 961 (1984).

The record indicates that the trial court considered Theresa's need and Hugh's limited resources. The trial court did not abuse its discretion.

### FEES ON APPEAL

Theresa seeks an award of $4,528.55 in attorney fees incurred on appeal. Theresa has complied with RAP 18.1, RCW 26.09.140, and *In re Marriage of Coons,* 53 Wn. App. 721, 770 P.2d 653 (1989), by filing an affidavit as to her present financial need. Hugh has filed no affidavit indicating that he has suffered adverse financial circumstances causing him to be unable to assist in payment of Theresa's attorney fees. We therefore award Theresa $3,000 in attorney fees, an amount we deem to be reasonably supported by the fee affidavit submitted, and the amount of professional time required to undertake this appeal, as evidenced by the briefs on file.

The decree is affirmed, except as otherwise ordered in the "Termination of Maintenance" section of this opinion.

FORREST, J., and COLE, J. Pro Tem., concur.

Review denied at 114 Wn.2d 1002 (1990).